UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| RUSSELL ROAD FOOD AND BEVERAGE, LLC, | Case No. 2:13-cv-00776-RFB-NJK |
| Plaintiff, | **ORDER** |
| v. | |
| MIKE GALAM, *et al.*, | |
| Defendants. | |

MIKE GALAM, *et al.*,

Counterclaimants,

v.

RUSSELL ROAD FOOD AND BEVERAGE, LLC,

Counterdefendant.

## I.     INTRODUCTION

This case involves a dispute between two owners of real property in Las Vegas: Plaintiff, who allegedly owns the Crazy Horse III trademark, and Defendants/Counterclaimants, who allege that they own the Crazy Horse Too mark. The parties have asserted competing trademark infringement claims, each claiming prior use over the other, and each has also moved for summary judgment. For the reasons discussed below, the Court determines that Defendants never acquired the Crazy Horse Too trademark. Therefore, summary judgment must be granted in Plaintiffs' favor on all of its claims and all of Defendants' counterclaims.

## II.     BACKGROUND

### A.  Procedural History

Plaintiff Russell Road Food and Beverage, LLC ("Russell Road") filed suit in this Court on May 2, 2013 against Defendants Canico Capital Group, LLC, Rhino Bare Projects, LLC, Industrial Road 2440-2497, LLC, Crazy Horse Too Gentlemen's Club, LLC, and various related entities and individuals it alleges are members of those entities. In its Complaint, Russell Road claims trademark infringement and trademark dilution and seeks to cancel Defendants' trademark registration. Defendants are a group of individuals and entities who claim to be the rightful owners of the trademark "Crazy Horse Too" and have asserted identical counterclaims against Russell Road.

In its Complaint, Russell Road alleges that it opened the Crazy Horse III Gentlemen's Club on September 4, 2009 in Las Vegas, Nevada, and that at that time there were no other strip clubs in Las Vegas that used the name Crazy Horse. Russell Road alleges that in April 2013, Defendants began advertising the opening of the Crazy Horse Too Gentlemen's Club following their 2011 purchase of certain real property located on Industrial Road in Las Vegas. This real property was the site of the former Crazy Horse Too strip club, which was owned by The Power Company, Inc. Russell Road alleges that this club opened in 1984 and was closed in 2006, when The Power Company forfeited it to the United States Government following a guilty plea in United States of America v. The Power Company, Inc., No. 2:06-cr-00186-PMP-PAL (D. Nev.).

Russell Road alleges that Defendants' use of the Crazy Horse Too mark infringes on its Crazy Horse III mark, as Russell Road was the first to use its mark. Russell Road also argues that Defendants cannot rely on the earlier use of the Crazy Horse Too mark from 1984-2006 because the club was subsequently closed, the mark was forfeited to the United States government, and Defendants did not acquire the mark when they purchased the Industrial Road property in 2011. Alternatively, Russell Road argues that the mark was abandoned during the nearly six years of non-use when the property was in the possession of the government. In response, Russell Road argues that it can demonstrate an unbroken chain of title from The Power Company, the original owner of the Crazy Horse Too, to itself and that the mark was not abandoned.

On May 22, 2013, the Court issued a preliminary injunction against Defendants (1) enjoining them from using the Crazy Horse Too mark and any variations thereof, and (2) ordering them to remove all signage, disable all websites, and remove all promotional materials featuring the Crazy Horse Too mark. Order, ECF No. 46. On February 10, 2014, the Court vacated its earlier preliminary injunction, finding that certain additional documents presented by Defendants demonstrated that they had likely acquired the Crazy Horse Too mark in 2011 and that the mark was likely not abandoned. Order, ECF No. 127. On December 1, 2014, the U.S. Court of Appeals for the Ninth Circuit reversed this Court's order vacating the preliminary injunction and remanded "for further proceedings to determine whether [Defendants] have some other basis for claiming ownership of the trademark and, if so, whether the trademark was abandoned by the United States before it was acquired by appellees." Mem. at 3, ECF No. 210.[1]

After remand, this Court permitted Defendants to request the production of documents from the U.S. Attorney's Office and permitted the parties to supplement their summary judgment and preliminary injunction motions with material received from that request. Minutes of Proceedings, ECF Nos. 222, 235, 249, 259. The Court permitted this limited additional discovery in order to provide Defendants with an opportunity to identify any additional basis for claiming ownership of the mark, as ordered by the Ninth Circuit. The U.S. Attorney's Office provided the parties with additional documents, and the parties filed supplemental briefs and responses.

On September 30, 2015, the Court decided the pending motions for summary judgment. Minute Order in Chambers, ECF No. 273. The Court granted Russell Road's Motion for Summary Judgment Based on Defendants' Failure to Acquire the Crazy Horse Too Trademark (ECF No. 181), denied Russell Road's remaining Motions for Summary Judgment as moot, and denied Defendants' Motion for Summary Judgment (ECF No. 177). This Order sets forth the Court's reasoning for its rulings.

. . .

. . .

---

[1] The Ninth Circuit's order of reversal became final on December 24, 2014. Order on Mandate, ECF No. 213.

**B.  Undisputed Facts**

For purposes of summary judgment, the Court finds the following facts to be undisputed. The Crazy Horse Too club opened in 1984 at 2476 Industrial Road in Las Vegas, Nevada. Defs.' Resp. to Requests for Admissions Nos. 1-2, ECF No. 98-1. Beginning in 1984, the Power Company, Inc. operated the Crazy Horse Too club and owned the Crazy Horse Too business and trademark. Defs.' Resp. to Requests for Admissions Nos. 1-3; Decl. of Bruno Tarabichi ¶¶ 1-2 & Ex. A, ECF No. 43-1. RicRiz, LLC ("RicRiz") was formed in 2002 and, sometime on or before October 26, 2005, became the owner of the real property located at 2440-2497 Industrial Road, which includes the property on which the Crazy Horse Too club was located. Decl. of Bruno Tarabichi ¶¶ 3-5, ECF No. 43-1; Deed of Trust, ECF No. 91-6.

On October 26, 2005, RicRiz obtained a $5 million loan from Security Pacific Bank that was secured by a Deed of Trust granted by RicRiz for the real property at 2440-2494 Industrial Road. Promissory Note, ECF No. 91-5; Deed of Trust, ECF No. 91-6. RicRiz was the sole trustor for the Deed of Trust; The Power Company was not a party to the Deed of Trust. Id. Security Pacific Bank also obtained a guaranty from The Power Company that required The Power Company to guarantee "the full and prompt payment and performance" to Security Pacific Bank of all of RicRiz's indebtedness under the Promissory Note and Deed of Trust. Continuing Guaranty of Payment and Performance ¶ 1, ECF No. 91-2. Through the Continuing Guaranty, The Power Company granted a security interest to Security Pacific Bank in all of The Power Company's property "now or hereafter in the physical possession of or on deposit with" Security Pacific Bank. Id. ¶ 5. However, the Crazy Horse Too trademark was never in the physical possession of, nor on deposit with, Security Pacific Bank. Dep. of Michael R. Mushkin 75:1-77:8, ECF No. 98-1 ("Mushkin Dep."); Def. Canico's Resp. to Interrogatory No. 4, ECF No. 98-1, Ex. E.

On December 5, 2005, Security Pacific Bank filed a UCC Financing Statement, with RicRiz named as the Debtor, that listed as collateral the personal and real property of RicRiz, including the real property at 2440-2494 Industrial Road. ECF No. 91-8. Neither Security Pacific Bank nor any other party filed a UCC Financing Statement or any other instrument to perfect any

1    security interest in the property of The Power Company. Mushkin Dep. 41:4-42:15.

2           Through a series of assignments, the loan from Security Pacific Bank to RicRiz—which

3    was secured by the Deed of Trust granted by RicRiz for the real property on Industrial Road—

4    was acquired by Defendant Canico Capital Group, LLC ("Canico") on July 23, 2009. Decl. of

5    Bruno Tarabichi ¶ 23, ECF No. 16; Decl. of Abraham Assil, ECF No. 16-10; Id. Ex. B.

6           The Crazy Horse Too club closed in September of 2006 or 2007.[2] On August 16, 2007,

7    the real property at 2440-2497 Industrial Road and the Crazy Horse Too business, including the

8    Crazy Horse Too trademark, were forfeited to the United States government. Defs.' Resp. to

9    Requests for Admissions No. 68; Order, ECF No. 91-12. These assets were ordered to be sold

10   and applied to The Power Company's and Frederick Rizzolo's forfeiture and restitution

11   obligations in connection with the judgments entered in the Power Company criminal case.

12   Order at 2, ECF No. 91-12.

13          However, the government still had not sold the property after three and a half years, and

14   on February 28, 2011, the court in the Power Company case permitted Canico to conduct a non-

15   judicial foreclosure sale of the property that was subject to the Deed of Trust granted by RicRiz.

16   Order of Sale, ECF No. 91-19; see also Order, Dec. 22, 2010, ECF No. 91-18 (discussing

17   Canico's property interests). The court also found that "the foreclosure sale by Canico Capital

18   Group, LLC, is a sale for all purposes, including the plea agreements, the Second Amended

19   Order of Forfeiture, and the Order [filed December 22, 2010] amending the Second Amended

20   Order of Forfeiture which substituted [Canico] for Security Pacific Bank and ordered that

21   [Canico] retain Security Pacific Bank's priority position." Order of Sale at 2, ECF No. 91-19. On

22   July 1, 2011, Chicago Title of Nevada, Inc., on behalf of Canico, conducted a foreclosure sale of

23   the real property secured by the Deed of Trust granted by RicRiz, and the real property was sold

24   to Industrial Road 2440-2497, LLC. Notice of Breach and Election to Sell Under Deed of Trust,

25   ECF No. 91-20; Trustee's Deed Upon Sale, ECF No. 91-22.

26          On September 4, 2009, after the Crazy Horse Too club had closed and before Defendants

27

28          [2] While the parties dispute whether the club closed in 2006 or 2007, the Court would come to the same legal conclusions using either date. Therefore, it is not necessary to determine the exact date for the purpose of this Order.

purchased the real property at the foreclosure sale, Russell Road began using the "Crazy Horse III" mark in connection with its gentlemen's club in Las Vegas. Decl. of Nando Sostilio, ECF No. 5 at ¶ 2. There were no other strip clubs in Las Vegas operating under the Crazy Horse name when Russell Road opened the Crazy Horse III club on September 4, 2009, and Russell Road has continuously used the Crazy Horse III mark since that date. Id. at ¶ 3. Russell Road has also invested significant resources in promoting its Crazy Horse III club, including through advertising and booking celebrities to appear at the club. Id. at ¶¶ 5-10.

After purchasing the real property at 2440-2494 Industrial Road, Defendants began using the Crazy Horse Too mark to promote the re-opening of the Crazy Horse Too club in April 2013. Id. at ¶¶ 5-6, 13.

### III.   LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 960 (9th Cir. 2011).

When the party moving for summary judgment also bears the burden of persuasion at trial, "to prevail on summary judgment it must show that the evidence is so powerful that no reasonable jury would be free to disbelieve it." Shakur v. Schriro, 514 F.3d 878, 890 (9th Cir. 2008) (citation and internal quotation marks omitted); see also So. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003) (moving party with burden of persuasion at trial must "establish beyond controversy every essential element" of its claim) (internal quotation marks omitted). To make this showing, the moving party "bears the initial burden of establishing the absence of a genuine issue of fact on each issue material to" its claim or affirmative defense. Houghton v. South, 965 F.2d 1532, 1537 (9th Cir. 1992). If it does so, the opposing party cannot

1    simply rest on its pleadings, but "must set forth specific facts," by affidavit or otherwise,

2    "showing that there is a genuine issue for trial." Miller v. Glenn Miller Prods., Inc., 454 F.3d

3    975, 987 (9th Cir. 2006) (citation and internal quotation marks omitted).

4          Where the party seeking summary judgment does not have the ultimate burden of

5    persuasion at trial, it "has both the initial burden of production and the ultimate burden of

6    persuasion on a motion for summary judgment." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz

7    Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000). "In order to carry its [initial] burden of

8    production, the moving party must either produce evidence negating an essential element of the

9    nonmoving party's claim or defense or show that the nonmoving party does not have enough

10   evidence of an essential element to carry its ultimate burden of persuasion at trial." Id. If it fails

11   to carry this initial burden, "the nonmoving party has no obligation to produce anything, even if

12   the nonmoving party would have the ultimate burden of persuasion at trial." Id. at 1102-03. If the

13   movant has carried its initial burden, "the nonmoving party must produce evidence to support its

14   claim or defense." Id. at 1103. However, the ultimate burden of persuasion on a motion for

15   summary judgment rests with the moving party, who must convince the court that no genuine

16   issue of material fact exists. Nissan Fire, 210 F.3d at 1102.

17

18   **IV.     ANALYSIS**

19         Russell Road's Complaint contains four claims for relief: (1) trademark infringement

20   under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) trademark infringement under

21   N.R.S. 600.420; (3) trademark dilution under N.R.S. 600.435; and (4) cancellation of Nevada

22   trademark registration under N.R.S. 600.390. ECF No. 1. Defendants' Amended Answer and

23   Counterclaim contains six causes of action asserted as counterclaims against Russell Road: (1)

24   trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1)(a);  (2) unfair competition

25   and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a); (3) dilution by

26   tarnishment under the Lanham Act, 15 U.S.C. § 1125(c); (4) trademark infringement under

27   Nevada common law; (5) cancellation of state marks from the Nevada state register under N.R.S.

28   600.390; and (6) Nevada unfair competition violations. ECF No. 79. After reviewing the parties'

1    motion papers and supplemental briefs, the Court concludes that summary judgment must be

2    granted in favor of Russell Road on each of its claims and each of Defendants' counterclaims.

3

4         **A. Lanham Act Trademark Infringement**

5         In order to prevail on a trademark infringement claim under the Lanham Act, "a plaintiff

6    must prove two basic elements: (1) it has a valid, protectable trademark, and (2) [the

7    defendant's] use of the mark is likely to cause confusion." <u>So. Cal. Darts Ass'n v. Zaffina</u>, 762

8    F.3d 921, 929 (9th Cir. 2014) (alteration in original) (internal quotation marks omitted). "The

9    first of these basic elements is comprised of two sub-parts: the mark's protectability and the

10    plaintiff's ownership of the mark." <u>Id.</u> The Court will first analyze these sub-parts, followed by

11    the question of likelihood of confusion.

12         *1. Protectability*

13         "Whether a mark is protectable depends on its degree of distinctiveness." <u>Id.</u> (internal

14    quotation marks omitted). "Distinctiveness measures the primary significance of the mark to the

15    purchasing public." <u>Zobmondo Entm't, LLC v. Falls Media, LLC</u>, 602 F.3d 1108, 1113 (9th Cir.

16    2010) (internal quotation marks omitted). There are five traditional categories of increasing

17    distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. <u>Id.</u>;

18    <u>Zaffina</u>, 762 F.3d at 929. Generic marks are not protectable, while suggestive, arbitrary, and

19    fanciful marks are entitled to automatic trademark protection. <u>Zaffina</u>, 762 F.3d at 929.

20    Descriptive marks are not eligible for automatic protection, but can "become protectable if they

21    acquire a 'secondary meaning,' by becoming distinctive 'as used on or in connection with the

22    applicant's goods in commerce.'" <u>Id.</u> (quoting 15 U.S.C. § 1052(f)); <u>Zobmondo</u>, 602 F.3d at

23    1113.

24         "Generic marks are 'those that refer to the genus of which the particular product is a

25    species.'" <u>One Indus., LLC v. Jim O'Neal Distrib., Inc.</u>, 578 F.3d 1154, 1164 (9th Cir. 2009)

26    (quoting <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 768 (1992)). Descriptive marks

27    "directly describe the quality or features of the product." <u>Brookfield Commc'ns, Inc. v. West</u>

28    <u>Coast Entm't Corp.</u>, 174 F.3d 1036, 1058 n.19 (9th Cir. 1999). Suggestive marks, while

1   "convey[ing] the impression of a good," nonetheless still "require[ ] the exercise of some
2   imagination and perception to reach a conclusion as to the product's nature." Id. (citing the
3   "Roach Motel" insect trap in Am. Home Prods. Corp. v. Johnson Chem. Co., 589 F.2d 103 (2d
4   Cir. 1978), as an example of a suggestive mark). "Arbitrary and fanciful marks have no intrinsic
5   connection to the product with which the mark is used; the former consists of words commonly
6   used in the English language, whereas the latter are wholly made-up terms." Id. (citations
7   omitted) (giving "Black & White" scotch whiskey as an example of an arbitrary mark, and
8   "Clorox" bleach as an example of a fanciful mark).

9      Here, the Court finds that Russell Road's "Crazy Horse III" mark is an arbitrary mark.
10   The words "Crazy Horse III" have no intrinsic connection with the services provided in
11   connection with the mark. The words do not directly describe the nature, quality, or features of a
12   strip club, nor do they convey the impression of a strip club, and therefore the mark is not
13   generic, descriptive, or suggestive. It is also not fanciful, because the words "Crazy Horse III"
14   are commonly used in the English language. Therefore, "Crazy Horse III" is an arbitrary mark
15   entitled to trademark protection.[3]

16          *2.   Ownership*

17      "A party's ownership of a protectable mark is determined on the basis of priority of use
18   in commerce. That is, the party claiming ownership must have been the first to actually use the
19   mark in the sale of goods or services." Zaffina, 762 F.3d at 930 (internal quotation marks
20   omitted); see also 15 U.S.C. § 1127 ("For purposes of this chapter, a mark shall be deemed to be
21   in use in commerce . . . on services when it is used or displayed in the sale or advertising of
22   services and the services are rendered in commerce . . . .").

23      Here, the undisputed evidence shows that Russell Road has been using its Crazy Horse
24   III mark in commerce since it opened its club under that name on September 4, 2009. The
25   evidence also shows that Defendants purchased the real property where the former Crazy Horse
26   Too club was located in a foreclosure sale on July 1, 2011, and began promoting the reopening

27
28          [3] While the Court would also find that Defendants' "Crazy Horse Too" mark is an arbitrary mark
       entitled to trademark protection, it need not do so here because, as will be discussed below, Defendants'
       mark is likely to cause confusion and Defendants cannot establish priority of use.

1  of the club in April 2013. Based on this evidence, Russell Road has demonstrated priority of use

2  in commerce.

3        Defendants argue that they have established a chain of title from their purchase of the

4  Crazy Horse Too mark at the July 1, 2011 foreclosure sale dating back to The Power Company's

5  prior use of the mark, which began in 1984. To establish priority of use, Defendants "must be

6  able to prove a chain of title extending back to the original user of the mark." 3 McCarthy on

7  Trademarks and Unfair Competition § 18:15 (4th ed.); cf. <u>Fleischer Studios, Inc. v. A.V.E.L.A.,</u>

8  <u>Inc.</u>, 654 F.3d 958, 962-63 (9th Cir. 2011) (a complete chain of title is necessary to establish

9  ownership of a copyright). Based on its review of the evidence, the Court concludes that

10  Defendants did not acquire the Crazy Horse Too mark from The Power Company or the federal

11  government, and therefore cannot establish the chain of title necessary to show priority of use of

12  the mark. There are two reasons for this conclusion.

13        First, in its order reversing this Court's order vacating the preliminary injunction, the

14  Ninth Circuit held that the documents before the court on appeal did not prove that Defendants

15  acquired the Crazy Horse Too trademark at the July 1, 2011 foreclosure sale. This was a legal

16  conclusion about the effect of the documents in evidence and constitutes binding law of the case.

17  <u>Ranchers Cattlemen v. U.S. Dep't of Agric.</u>, 499 F.3d 1108, 1114 (9th Cir. 2007) ("[T]he general

18  rule [is] that our decisions at the preliminary injunction phase do not constitute the law of the

19  case. Any of our conclusions on pure issues of law, however, are binding.") (citations and

20  internal quotation marks omitted). "The district court must apply this law to the facts anew with

21  consideration of the evidence presented in the merits phase." <u>Id.</u>

22        Defendants do not dispute that on appeal, the Ninth Circuit had the entire evidentiary

23  record in this case before it—a record that is substantially the same as the one before this Court

24  on summary judgment.[4] Based upon this record, the Ninth Circuit held as follows:

25  

26      [4] Russell Road contends that the only evidence not before the Ninth Circuit on appeal was (1) the
deposition of Chicago Title of Nevada, Inc. and (2) an email from Defendants to the U.S. Attorney's

27  Office for the District of Nevada on December 2, 2014, asking the United States to transfer ownership of
the mark to Defendants. Defendants do not dispute this contention, and do not argue that either piece of

28  evidence would provide a basis for altering the Ninth Circuit's ruling. The Court has also reviewed these
documents and finds that they are not a basis for altering any ruling made by the Ninth Circuit.

1

2

3

4

5

6

7

8

9

10

11

12

          The district court erred in holding that The Power Company's guaranty proved that its Crazy Horse Too trademark was included in the collateral subject to appellees' lien, and that appellees therefore obtained ownership of the trademark when they foreclosed. The trustee's deed of sale shows that appellees purchased at the non-judicial foreclosure sale only the real property formerly owned by RicRiz, LLC, which did not include The Power Company's trademark. The order of the court in the forfeiture action, stating that the sale was to be a "sale for all purposes," does not change the legal effect of the non-judicial foreclosure sale. Even if appellees had attempted to enforce the guaranty (and there is no evidence that they did so), the guaranty provided a security interest only in property "in the physical possession of or on deposit with the Lender," which appellees have not shown includes the Crazy Horse Too trademark. Although The Power Company's corporate resolutions authorized The Power Company to give appellees a security interest in the trademark, The Power Company did not expressly provide such a security interest in the guaranty. Appellees have presented no document that gives them a security interest in the Crazy Horse Too trademark owned by The Power Company or that indicates they obtained the trademark in the foreclosure sale.

13

14

15

16

          We reverse the district court's order vacating the preliminary injunction and remand for further proceedings to determine whether appellees have some other basis for claiming ownership of the trademark and, if so, whether the trademark was abandoned by the United States before it was acquired by appellees.

17

18

19

20

21

22

23

24

Mem. at 2-3, ECF No. 210. Despite being granted additional discovery, Defendants have produced no additional evidence that would establish a basis for claiming ownership of the Crazy Horse Too mark.[5] Therefore, the Court is bound by the Ninth Circuit's legal conclusion that, based upon the record before it (and before this Court), Defendants did not obtain the Crazy Horse Too trademark at the foreclosure sale. Instead, Defendants acquired only the real property subject to the Deed of Trust granted by RicRiz—the real property located at 2440-2494 Industrial Road.

25

26

27

28

---

[5] In their supplemental brief, Defendants provide a single letter from the United States Marshals Service to the owner of the Crazy Horse III club dated July 8, 2009, advising the Crazy Horse III owner that the government was still attempting to sell the Crazy Horse Too and that the eventual buyers may elect to pursue litigation against the owners of the Crazy Horse III. This document does nothing to aid Defendants in their effort to prove that they acquired the Crazy Horse Too mark at the non-judicial foreclosure sale.

Second, even if the Ninth Circuit's decision on appeal were not binding, the Court would find that Defendants have not acquired the Crazy Horse Too mark. RicRiz was the sole trustor in the Deed of Trust granted to Security Pacific Bank (and later acquired and foreclosed on by Canico). In the Deed of Trust, RicRiz granted a security interest in only the real property located at 2440-2494 Industrial Road. It could not have granted a security interest in the Crazy Horse Too mark because it did not own the mark—The Power Company did, and The Power Company was not a party to the Deed of Trust. While The Power Company did grant a security interest to Security Pacific Bank through its Continuing Guaranty, that security interest was only in The Power Company's property "now or hereafter in the physical possession of or on deposit with" Security Pacific Bank. Defendants have produced no evidence that any of The Power Company's property, particularly the Crazy Horse Too mark, was "in the physical possession of or on deposit with" Security Pacific Bank. Defendants point to the UCC financing statement filed by Security Pacific Bank, which purports to cover all trade names and trademarks used in connection with the real property located at 2440-2494 Industrial Road. However, the UCC financing statement covers trademarks only insofar as they constitute property of the Debtor, which is identified as RicRiz. Defendants have therefore produced no evidence that the Crazy Horse Too trademark was included in the collateral that was pledged to Security Pacific Bank, foreclosed upon by Canico, and purchased by Industrial Road 2440-2497, LLC at the foreclosure sale.[6]

In their supplemental brief, Defendants contend that they received the Crazy Horse Too trademark pursuant to the automatic transfer doctrine. This argument is unavailing. Under this common law doctrine, "[w]hen a business is sold as a going concern, trademarks and the good will of the business that they symbolize are presumed to pass with the sale of the business." McCarthy on Trademarks & Unfair Competition § 18:37; see also id. n.1 (collecting cases); Yellowbook Inc. v. Brandeberry, 708 F.3d 837, 844 (6th Cir. 2013). Here, however, there is no evidence that Defendants acquired the Crazy Horse Too business *at all*, let alone as a going

---

[6] Like the Ninth Circuit, this Court finds that the statement by the court in the Power Company criminal case that the sale was to be a "sale for all purposes," including the orders of forfeiture entered in that case, simply does not change what was sold and purchased at the non-judicial foreclosure sale.

concern. As discussed above, Defendants purchased only the real property located at 2440-2494 Industrial Road at the non-judicial foreclosure sale. They did not purchase the Crazy Horse Too business, nor could they have—the business was owned by The Power Company, while Defendants purchased the real property of RicRiz.

The Court similarly rejects Defendants' related argument that they acquired "every aspect and facet of the Crazy Horse Too Gentlemen's Club," including the building, signage, tables, chairs, stages, poles, and other fixtures, and that these physical aspects of the business "*are* the business and thus are inextricably tied to its goodwill." Supp. Br. at 6, ECF No. 265. Defendants have presented no document showing that they acquired anything other than what was secured by the Deed of Trust, which included only the real property and any buildings, fixtures, easements, and water and mineral rights necessarily relating to that property. There is simply no evidence in the record to support Defendants' contention that their purchase of real property somehow also transferred the Crazy Horse Too business, which was owned by an entirely separate entity, to them.

Therefore, there is no genuine issue of material fact as to ownership. Defendants have not established a chain of title that predates Russell Road's first use of its Crazy Horse III mark in 2009, and Russell Road has thus shown priority of use.[7]

### *3. Likelihood of Confusion*

In determining whether the defendant's use of the mark is likely to cause confusion, courts weigh eight factors, known as the <u>Sleekcraft</u> factors: "(1) the strength of the mark; (2) the proximity of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines." <u>Zaffina</u>, 762 F.3d at 930 (citing <u>AMF Inc. v. Sleekcraft Boats</u>, 599 F.2d 341, 348–49 (9th Cir.1979)).

---

[7] The Court declines to consider Defendants' final argument, raised in their supplemental brief, that it should deny relief to Russell Road under its equitable powers. This argument was not raised in Defendants' initial summary judgment papers and is not a new "basis for claiming ownership of the trademark" for which the Court permitted additional discovery and briefing.

1    No single one of the <u>Sleekcraft</u> factors is determinative, and courts consider the totality of

2    circumstances in each case to resolve the likelihood-of-confusion inquiry. <u>Zaffina</u>, 762 F.3d at

3    930. Indeed, the factors are not intended as a "rote checklist," but are rather intended as helpful

4    guides to the district court. <u>Network Automation, Inc. v. Advanced Sys. Concepts, Inc.</u>, 638 F.3d

5    1137, 1145 (9th Cir. 2011). The factors "were not meant to be requirements or hoops that a

6    district court need jump through to make the determination," and the Ninth Circuit "has never

7    articulated specific factors that a district court must recite and apply." <u>Eclipse Assocs. v. Data</u>

8    <u>Gen. Corp.</u>, 894 F.2d 1114, 1118 (9th Cir. 1990). Instead, the Ninth Circuit has "identified a non-

9    exclusive series of factors that are helpful in making the ultimate factual determination." <u>Id.</u>

10    The parties do not dispute that the use of both marks is likely to cause confusion; in fact,

11    both sides devote substantial effort to arguing that this element of trademark infringement is met.

12    Therefore, there is no need for the Court to engage in an exhaustive analysis of the <u>Sleekcraft</u>

13    factors here. Nevertheless, the Court has reviewed the evidence submitted by the parties and

14    concludes that Defendants' use of the Crazy Horse Too mark is likely to cause consumer

15    confusion. Based upon its review, the Court makes the following findings.

16    First, the "Crazy Horse III" mark is conceptually strong because, as discussed above, it is

17    an arbitrary mark and therefore entitled to maximum protection. <u>Entrepreneur Media, Inc. v.</u>

18    <u>Smith</u>, 279 F.3d 1135, 1141 (9th Cir. 2002).

19    Second, the mark is also commercially strong. A mark's commercial strength is increased

20    by factors such as "extensive advertising, length of exclusive use, [and] public recognition." <u>Id.</u>

21    at 1144. Russell Road has produced evidence that it spends over a million dollars per year on

22    marketing, hiring dancers, and booking celebrities in order to build its name recognition in Las

23    Vegas. Russell Road has also produced evidence that there were no other strip clubs operating

24    under the name "Crazy Horse" for at least three years prior to its September 4, 2009 opening and

25    that the Crazy Horse III was the only strip club operating under that name for at least three and a

26    half years after its opening. Finally, Russell Road's evidence shows that it has received

27    significant media coverage due to celebrities attending the club and received an award for "2012

28

- 14 -

1   Club of the Year/West" at the 15th annual Adult Nightclub & Exotic Dancer Award Show in Las

2   Vegas.

3          Third, the parties' services are related. Services are related if the public consuming those

4   services would reasonably think they were from the same source if they were offered under the

5   same mark. Entrepreneur Media, 279 F.3d at 1147. Here, Defendants have admitted that the

6   services provided by them under the Crazy Horse Too mark are similar to the services provided

7   by Russell Road under the Crazy Horse III mark. It is also undisputed that the parties offer

8   similar services in the form of partially nude dancing women, alcohol, and other adult

9   entertainment to customers.

10         Fourth, the parties' marks are similar. "Similarity of the marks is tested on three levels:

11  sight, sound, and meaning. Each must be considered as they are encountered in the marketplace."

12  Network Automation, 638 F.3d at 1150 (quoting Sleekcraft, 599 F.2d at 351). Defendants admit,

13  and both parties argue, that the marks are similar in sound and meaning. The marks are also

14  similar in sight. Two of the three words are identical in each mark, and the remaining word

15  ("Too" vs. "III") suggests that one mark is a predecessor or successor to the other. Moreover, the

16  logos of both clubs feature black backgrounds, white text, and images of horses.

17         Fifth, there has been a substantial amount of actual confusion among consumers. "[A]

18  showing of actual confusion among significant numbers of consumers provides strong support

19  for the likelihood of confusion." Playboy Enters., Inc. v. Netscape Commc'ns Corp., 354 F.3d

20  1020, 1026 (9th Cir. 2004). Russell Road has provided evidence—upon which Defendants have

21  also relied in connection with their argument—of significant actual confusion among consumers

22  in the form of job applicants coming to the wrong location and taxicab drivers, limo drivers,

23  doormen, dancers, and bartenders being asked hundreds of questions about the relationship

24  between the clubs. In addition, Defendants have provided a declaration from Michael Galam,

25  manager of Crazy Horse Too Gentlemen's Club, LLC and a named defendant in this case, stating

26  that he has "witnessed much confusion" caused by the similar names and that dozens of people

27  intending to visit Crazy Horse Too have been mistakenly taken to Crazy Horse III.

28

1   Based upon these findings, the Court concludes that Russell Road has established a

2   likelihood of confusion. Russell Road is therefore entitled to summary judgment on its Lanham

3   Act trademark infringement claim.

4   **B.  Russell Road's Remaining Claims**

5   In addition to trademark infringement under the Lanham Act, Russell Road has alleged

6   claims for trademark infringement, trademark dilution, and cancellation of trademark registration

7   under Nevada law. The Court finds that summary judgment must be granted in Russell Road's

8   favor on each of these claims as well.

9   ***1.  Trademark Infringement Under N.R.S. 600.420***

10  N.R.S. 600.420, in relevant part, states as follows:

> Any person:
> 1. Who uses, without the consent of the registrant, any reproduction,
> counterfeit, copy or colorable imitation of a mark registered in this State in
> connection with the sale, offering for sale or advertising of any goods or
> services, which use is likely to cause confusion or mistake or result in
> deception as to the source of origin of such goods or services;
> . . .
> is liable in a civil action by the owner of the registered mark for any or all
> of the remedies provided in NRS 600.430, except that the owner of the
> mark is not entitled to recover profits or damages under subsection 2
> unless the act or acts were committed with knowledge that the
> reproduction, counterfeit, copy or imitation of the mark was intended to be
> used to cause confusion, mistake or deception.

19  The statute does not define the terms "reproduction," "counterfeit," "copy," or "colorable

20  imitation." However, N.R.S. 600.420 is substantially identical to the remedies provision of the

21  Lanham Act,[8] which does define the term "colorable imitation." The Court will therefore adopt

22  the definitions of these terms as set forth in the Lanham Act. Doing so is consistent with the

23  Nevada Supreme Court's interpretation of common law tradename infringement, which focuses

24  on the same two core elements (creation of a protectable right and likelihood of confusion) as

---

[8] This section of the Lanham Act provides that "[a]ny person who shall, without the consent of the registrant . . . (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided." 15 U.S.C. § 1114(1).

under federal law. <u>A.L.M.N., Inc. v. Rosoff</u>, 757 P.2d 1319, 1321 (Nev. 1988); <u>see also</u> <u>BMW of</u> <u>N. Am. v. Quality Star Benzz LLC</u>, No. 2:12-cv-889-GMN-VCF, 2013 WL 1338233, at *3 (D. Nev. Mar. 29, 2013) ("The elements necessary to make out a claim of Nevada common law trademark infringement are identical to the elements necessary under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).") (internal quotation marks omitted).

Under the Lanham Act, "[t]he term 'colorable imitation' includes any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive." 15 U.S.C. § 1127. The factors considered in determining whether a mark is likely to cause confusion are substantially the same under both Nevada law and federal law. <u>Compare</u> <u>A.L.M.N., Inc.</u>, 757 P.2d at 282, <u>with</u> Section IV.A.3, <u>supra</u>.

The Court has already found that Russell Road has established priority of use of its Crazy Horse III mark and that Defendants' use of the Crazy Horse Too mark is likely to cause consumer confusion. <u>See</u> Section IV.A, <u>supra</u>. The evidence demonstrates that Russell Road has not consented to Defendants' use of the mark. Russell Road has also provided evidence that it owns two Nevada trademark registrations for its Crazy Horse III trademark, which were issued on June 15, 2010. Decl. of Bruno Tarabichi Ex. A, ECF No. 16-1. The Court therefore finds that Russell Road has established that Defendants used a colorable imitation of its registered Crazy Horse III mark without Russell Road's consent. Accordingly, the Court grants summary judgment in favor of Russell Road on its claim for trademark infringement under N.R.S. 600.420.

An owner of a registered mark who prevails in a civil action under N.R.S. 600.420 may seek any or all of the remedies provides in N.R.S. 600.430. These include injunctive relief; payment to the registrant of all profits derived from, and damages caused by, the defendant's wrongful acts; treble damages for willful and wrongful acts; an order to deliver all imitations in the defendant's possession to the court or the plaintiff; and costs and reasonable attorney's fees. N.R.S. 600.430.

Here, the Court finds that Russell Road has established that it is entitled to injunctive relief, the right to receive Defendants' profits derived from the use of the Crazy Horse Too mark,

and Russell Road's damages suffered from Defendants' infringing acts. The Court will permit Russell Road to submit a motion specifying the relief it requests within these parameters. However, the Court does not find that Defendants' conduct was willful such that Russell Road would be entitled to treble damages.

### 2. Trademark Dilution Under N.R.S. 600.435

Russell Road's third claim is for trademark dilution under Nevada law. N.R.S. 600.435 states as follows:

> 1. Except as otherwise provided in subsection 4, the owner of a mark that is famous in [Nevada] may bring an action to enjoin commercial use of the mark by a person if such use:
>> (a) Begins after the mark has become famous; and
>> (b) Causes dilution of the mark.
> 2. In determining whether a mark is famous in this State, the court shall consider, without limitation, the following factors:
>> (a) The degree of inherent or acquired distinctiveness of the mark in this State.
>> (b) The duration and extent of use of the mark in connection with the goods and services with which the mark is used.
>> (c) The duration and extent of advertisement and promotion of the mark in this State.
>> (d) The geographical extent of the trading area in which the mark is used.
>> (e) The channels of trade for the goods or services with which the mark is used.
>> (f) The degree of recognition of the mark in the trading areas and channels of trade in this State used by the owner of the mark and the person against whom the injunction is sought.
>> (g) The nature and extent of use of the same or similar mark by other persons.
>> (h) Whether the mark is registered in this State or registered in the United States Patent and Trademark Office pursuant to federal law.
>
> . . .
>
> 5. As used in this section:
>
> . . .
>
>> (b) "Dilution" means a lessening in the capacity of a mark that is famous to identify and distinguish goods or services, regardless of the presence or absence of:

1

(1) Competition between the owner of the mark and other persons; or

2

(2) Likelihood of confusion, mistake or deception as to the source of origin of goods or services.

3

4

The Nevada Supreme Court has not analyzed the scope of a claim for Nevada trademark

5

dilution. However, the legislative history of N.R.S. 600.435 suggests that this provision was

6

modeled in part on the dilution provisions of the federal Lanham Act. See Nev. S. Comm. Min.,

7

Feb. 16, 2001 (statement from a Nevada attorney that the statute "follows similar provisions in

8

the federal Lanham Act."); Nev. Assem. Comm. Min., Apr. 23, 2001 (testimony that the bill that

9

would become N.R.S. 600.435 "emulated federal law"). This is supported by a comparison of

10

N.R.S. 600.435 with the Lanham Act's dilution provisions, which identify substantially the same

11

factors in making the determination of whether a mark is famous and distinctive. See N.R.S.

12

600.435(2); 15 U.S.C. § 1125(c)(2)(A). The Court therefore shall refer to federal law as

13

necessary to interpret the factors under N.R.S. 600.435.

14

1.  Famousness

15

Based on its analysis of the statutory factors, the Court finds that Russell Road has

16

established that its mark is famous within the adult entertainment market in Nevada. First, the

17

distinctiveness of the Crazy Horse III mark strongly favors Russell Road. As found previously

18

by the Court, Crazy Horse III is an arbitrary mark and therefore has a high degree of

19

distinctiveness. In addition, the mark is registered in Nevada, and "registration on the principal

20

register creates a presumption of distinctiveness." Avery Dennison Corp. v. Sumpton, 189 F.3d

21

868, 876 (9th Cir. 1999). Therefore, the first and eighth factors weigh strongly in favor of

22

Russell Road.

23

Next, the evidence establishes that Russell Road has used the Crazy Horse III mark

24

continuously since 2009 in connection with its provision of adult entertainment services and has

25

spent over a million dollars per year in advertising, marketing, and booking dancers and

26

celebrities to promote its business. As discussed above, Russell Road has also shown that there

27

were no other strip clubs operating under the name "Crazy Horse" within three years before or

28

1   after the opening of the Crazy Horse III club. Defendants have not disputed this evidence.

2   Therefore, the second, third, and seventh factors also favor Russell Road.

3       Finally, the remaining factors (geographical extent of the trading area, channels of trade,

4   and degree of recognition of the mark in the trading areas) also favor Russell Road. "[F]ame in a

5   localized trading area may meet the threshold element [of famousness] . . . if plaintiff's trading

6   area includes the trading area of the defendant. The rule is likewise for specialized market

7   segments: specialized fame can be adequate only if the diluting uses are directed narrowly at the

8   same market segment." Avery Dennison Corp., 189 F.3d at 877-78 (citations and internal

9   quotation marks omitted). Here, the evidence shows that the Crazy Horse III and Crazy Horse

10  Too clubs operate within the same trading area. Both clubs are located in Las Vegas and are only

11  5.2 miles apart. The clubs provide substantially similar adult entertainment services, which are

12  used by the same class of consumers in the same geographical location. The evidence also shows

13  that both parties advertise using billboards in Las Vegas and target the same consumers through

14  social media and text messages, so much so that on at least one occasion, Defendants sent a text

15  message to the very same recipients who were on Russell Road's text message list. Therefore,

16  these remaining factors also support a finding that Russell Road's Crazy Horse III mark is

17  famous within the state in the adult entertainment market.

            2.   Dilution

19      Under Nevada law, a plaintiff does not need to show likelihood of confusion in order to

20  prove dilution; all that is required is "a lessening in the capacity of a mark that is famous to

21  identify and distinguish goods or services." N.R.S. 600.435(5)(b). Russell Road has met that

22  standard here. As discussed previously, the evidence demonstrates that Defendants' use of the

23  Crazy Horse Too mark has caused substantial actual confusion among consumers, thereby

24  lessening the ability of Russell Road to use its Crazy Horse III mark to distinguish its services.

25      Based upon these findings, Russell Road is entitled to summary judgment on its Nevada

26  trademark dilution claim. Russell Road is therefore entitled to injunctive relief against

27  Defendants for their use of the Crazy Horse Too mark. See N.R.S. 600.435(3). However, as

28  discussed in connection with its Nevada trademark infringement claim, the Court does not find

1    that Defendants' use was willfully intended to cause dilution of Russell Road's mark; therefore,

2    Russell Road is not entitled to the other remedies under N.R.S. 600.430 on this claim. Id.

3                    *3.  Cancellation of Nevada Trademark Registration Under N.R.S. 600.390*

4            Russell Road's final cause of action is for cancellation of Defendants' trademark

5    registration. N.R.S. 600.390(3)(b) directs the Nevada Secretary of State to cancel "[a]ny

6    registration concerning which a court of competent jurisdiction finds that . . . (b) The registrant is

7    not the owner of the mark." As discussed in Section IV.A.2 above, this Court has found that

8    Defendants are not the owners of the Crazy Horse Too mark because they did not acquire it at

9    the July 2011 foreclosure sale or at any other time. Therefore, summary judgment is granted in

10   favor of Russell Road on this claim. The Court directs that Defendants' registration of the Crazy

11   Horse Too mark, filed by Industrial Road 2440-2497, LLC on September 24, 2012,[9] be cancelled

12   from the register in Nevada.

13

14       **C.  Defendants' Counterclaims**

15           The Court also concludes that summary judgment must be granted in favor of Russell

16   Road on all of Defendants' counterclaims.

17           First, Defendants claim trademark infringement under the Lanham Act, 15 U.S.C.

18   § 1114(a). The elements required to prevail on a claim under this section are the same as for a

19   claim under 15 U.S.C. § 1125(a): the party must prove (1) that it owns a protectable mark, and

20   (2) that the opposing party's use of the mark is likely to cause confusion among consumers.

21   Network Automation, 638 F.3d at 1144. As discussed above, the Court has found that Russell

22   Road's Crazy Horse III mark is a valid and protectable mark, that Russell Road has established

23   priority of use, and that the use of Defendants' mark is likely to cause confusion. Defendants

24   therefore cannot establish any of the essential elements for their trademark infringement claim,

25   and the Court grants summary judgment in favor of Russell Road on this counterclaim.

26           Second, Defendants claim unfair competition and false designation of origin under

27   Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The analysis of these claims "is

28

---

         [9] See Defs.' Resp. Mot. Prelim. Inj. Ex. O, ECF No. 32-14.

oftentimes identical" to infringement claims under Section 32 of the Act, 15 U.S.C. § 1114. <u>Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.</u>, 174 F.3d 1036, 1046 n.8 (9th Cir. 1999); <u>see also</u> <u>Int'l Order of Job's Daughters v. Lindeburg & Co.</u>, 633 F.2d 912, 917 (9th Cir. 1980) ("Both statutes preclude the use of another's trademark in a manner likely to confuse the public about the origin of the goods."). The Court finds that the analysis is indeed identical here—in order to prevail on this claim, Defendants must establish ownership through priority of use and likelihood of confusion. As previously found by the Court, however, Russell Road has established priority of use of its mark over Defendants. Therefore, Defendants cannot establish an essential element of their Section 43(a) claim, and summary judgment must be entered in Russell Road's favor.[10]

Third, Defendants assert a counterclaim for dilution by tarnishment under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). "In order to prove a [dilution] violation, a plaintiff must show that (1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment." <u>Jada Toys, Inc. v. Mattel, Inc.</u>, 518 F.3d 628, 634 (9th Cir. 2008). This claim also fails. The Court has found that Defendants never acquired the Crazy Horse Too mark and therefore cannot establish a chain of title dating back to first use of the mark in 1984. The Court has also found that Russell Road has established priority of use of its Crazy Horse III mark over Defendants. Consequently, Defendants cannot establish the third element of their dilution claim. Summary judgment is granted in favor of Russell Road on Defendants' third counterclaim.

Fourth, Defendants claim trademark infringement under Nevada common law. As discussed in Section IV.B.1 above, a common law infringement claim in Nevada requires the same two core elements as under federal law: (1) creation of a protectable right and (2) likelihood of confusion. <u>A.L.M.N., Inc.</u>, 757 P.2d at 1321-23. Russell Road has established

---

[10] <u>See also</u> <u>Chance v. Pac-Tel Teletrac Inc.</u>, 242 F.3d 1151, 1156 (9th Cir. 2001) ("To have prevented entry of summary judgment in the district court, [the plaintiff] would have had to come forward with some evidence beyond the mere pleadings to demonstrate a disputed issue of fact that [its] use of the TeleTrak service mark predated [the defendant's] first use.").

priority of use of its mark; therefore, this claim must also fail. Summary judgment is granted in favor of Russell Road on Defendants' fourth counterclaim.

Fifth, Defendants seek cancellation of Russell Road's registered marks from the Nevada register pursuant to N.R.S. 600.390. Under this statute, the court may order cancellation if it finds that the registrant is not the owner of the mark or if the registered mark has been abandoned, was granted improperly, was obtained fraudulently, or is likely to cause confusion because of its similarity to a previously registered mark. N.R.S. 600.390(3). Defendants have not produced any evidence that Russell Road is not the owner of the Crazy Horse III mark, nor have they shown that the mark was improperly granted or fraudulently obtained. And although the Court has found that the Crazy Horse III mark and Crazy Horse Too marks are likely to cause confusion, Defendants cannot establish that they are the owners of a previously registered mark because they have not proven a chain of title for the Crazy Horse Too mark. Summary judgment is therefore granted in favor of Russell Road on this claim.

Finally, Defendants assert a counterclaim for unfair competition under Nevada common law. Unfair competition is a broader category of law that covers trademark infringement. A.L.M.N., Inc., 757 P.2d at 1321; McCarthy on Trademarks & Unfair Competition § 2:7 ("[T]rademark infringement is a type of unfair competition"). In their sixth counterclaim, Defendants allege that Russell Road intentionally adopted a confusingly similar mark to benefit from Defendants' goodwill and reputation associated with the Crazy Horse Too mark. Defendants do not allege any additional facts that would give rise to a broader type of unfair competition claim. The Court therefore finds that this claim is exclusively concerned with Russell Road's alleged infringement. As already found by the Court, Russell Road has established prior use of its Crazy Horse III mark. Therefore, Defendants' unfair competition claim, which is based upon the same facts as its infringement claims, must fail. Summary judgment is granted in favor of Russell Road on Defendants' sixth counterclaim.[11]

---

[11] Even if the Court were to construe Defendants' sixth counterclaim as a broader unfair competition claim, the Court would grant summary judgment in Russell Road's favor. The evidence in the record shows that Russell Road adopted its mark at a time when the Crazy Horse Too mark was owned by the federal government. As Defendants never acquired the Crazy Horse Too mark, it appears that it has remained in the government's possession and may at this point be abandoned (a legal question

In sum, the Court concludes based on the evidence in the record that Defendants never acquired the Crazy Horse Too trademark and that Russell Road has shown priority of use of its Crazy Horse III trademark. The marks are likely to cause consumer confusion. Based on these findings, the Court grants summary judgment in favor of Russell Road on all of its affirmative claims and all of Defendants' counterclaims. Russell Road is entitled to injunctive relief, damages, and any profits derived by Defendants from their use of the Crazy Horse Too mark. The Court also orders the cancellation of Defendants' registration of the Crazy Horse Too mark, filed by Industrial Road 2440-2497, LLC on September 24, 2012.

## V. CONCLUSION

For the reasons stated in this opinion,

**IT IS ORDERED** that Defendants/Counterclaimants' Motion for Summary Judgment (ECF No. 177) is DENIED.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment Based on Defendants' Failure to Acquire the Crazy Horse Too Trademark (ECF No. 181) is GRANTED.

**IT IS FURTHER ORDERED** that Plaintiff's remaining Motions for Summary Judgment (ECF Nos. 180, 183, 184, and 187) are DENIED AS MOOT.

**IT IS FURTHER ORDERED** that Russell Road shall submit a motion and proposed order specifying the relief it seeks, within the parameters set in this Order, by **May 10, 2016**. Defendants' response is due by **May 24, 2016** and any reply is due by **June 7, 2016**.

**DATED**: April 13, 2016.

_____

**RICHARD F. BOULWARE, II**
**United States District Judge**

---

the Court declines to resolve here). Under these circumstances, the Court finds that Russell Road's actions do not constitute unfair competition.